Alan Dexter Bowman, on behalf of Appellant Shark James, and with your Honor's permission, I will reserve two minutes for rebuttal. I would also advise the Court, based on what you might call a division of labor based on time considerations, Mr. Cravatan will primarily bear the laboring or on the sentencing issue and it relates more specifically. I see. So he's not representing... So it's not James vs. Riley, it's the substantive issues. Right. It's United States vs. Riley and James and Riley and James have divided the time to argue before your Court and also, to some degree, decided upon the best methodology for presentation of issues by respective counsel, Your Honor. We're interested in hearing however you want to tell it to us. Thank you, Your Honor. I shall start with the fraud counts, which we challenge. I would point out that they were grouped for the purposes of our point one analysis, conjunctively because it has always been my conception and generally the configuration of the law that whenever one speaks of fraud, one necessarily implicates some concept of deception for private gain. And to the extent that the different groupings, mail fraud and fraud from the local government receiving federal funds and honest services fraud are all frauds, they have to have that common... Well, I was going to ask you that. Yes, Your Honor. I mean, if... Let's assume for the moment, because we really don't know, that, well, let's say if the Supreme Court can't sustain that under a due process examination, doesn't the mail fraud charges still remain? I mean... I don't think so, Your Honor. Well, and tell us why. Well, honestly, yes. Well, let me retrench on that particular hasty response. I think that the honest services fraud statute can be struck down and also not touch upon the general conception of mail fraud. But the particular problem in this case is that there was no demonstration of a fraud, a deception on the part of Appellant Sharp James or any private gain. Now, I want to say this about the honest services aspect because the government yesterday forwarded a letter to this court wherein it made reference to the United States versus McGeehan. Now, McGeehan's a very... And the court was primarily focused on the fact that McGeehan was a private individual as opposed to a public official. And the issue with respect to whether or not honest services could still apply to him. This court's configuration of honest services, as set forth previously in Anico and Panarello and Murphy in those cases, was that you have to show some fiduciary duty arising out of state or federal law in order for there to be an honest services conception. And with respect to the theory relied upon by the government in this case, an undisclosed conflict of interest in McGeehan, this court said that that undisclosed conflict, if it exists, has to be with respect to a financial interest. Now, I think that under McGeehan, without regard to whatever, in Anico and those... Without regard to whatever the United States Supreme Court does in black, way rich and skilling, that this court should feel relatively comfortable that the honest services conviction in this case cannot stand. And our perspective, when I answer your honest question a little bit what I would call hastily with respect to whether or not the falling of the honest services counts also requires that the mail fraud and count four also fall, my response with respect to that is based upon this. There was no demonstration by the United States that Sharp James participated knowingly in that deception or he in any fashion benefited from it. With respect to mail fraud or any other form of fraud. But if his girlfriend benefited and if he, as the evidence showed, intervened indirectly to help his girlfriend get some of the properties, as you could read the evidence to show, isn't that a benefit? Does he have to have a benefit in dollars and cents? Well, your Honor, there was no evidence that Sharp James intervened so that Ms. Rowley could receive any benefit or acquire any property. Somebody said, the mayor said that you should treat these ladies well. Well, that's one of the issues that we challenge in this particular case. There was a fellow by the name of Al Fiella who was unavailable at trial because he had asserted his Fifth Amendment privilege. He too was an employee of the city. And at some point, Basil Franklin claimed that Al Fiella brought Tamika Rowley and another person down and said, the mayor wants you to help these ladies acquire property. We read this. But your Honor. And the jury believed it. Well, jury. I mean, because we have a jury verdict. The jury should never have heard it because there was no way to test the trustworthiness of it absent Mr. Fiella's presence. And in that particular concept, the government was able to persuade Judge Martini that somehow, in a fashion inconsistent with the basic theory of the prosecution, that his comment in this regard, unable to be tested, was in some fashion made on the basis of his agency relationship with Sharp James. Now, the government juxtaposed that against the concept that if Al Fiella said that to Basil Franklin in the fashion they wanted to have it interpreted, it would have been true. Now, I want to say also, Your Honor, in this- Well, wait, wait, wait, wait. We have two separate issues. One is, was there evidence before the jury that could be attributed to James? And you'd say, well, it shouldn't have come in under 801-D2-D. But it came in, I mean, if we don't get into that, there was evidence. And all I'm asking you is, assume that it came in appropriately, as the judge found. Does the gain to James, if his girlfriend got something out of this, does the benefit to James have to be dollars and cents? No. But I have to give- And you're taking me off- No, but- It shouldn't have come- I had to give Your Honor a more complete, factual response to what Your Honor is saying. I mean- Basil Franklin- Well, I'm talking a legal one. As a matter of law, does it have to- can the benefit be something other than dollars and cents? Well, if Your Honor just gives me a little bit of patience for one regard, just with respect to Your Honor's initial question, that is, Basil Franklin, who was the hearer of this alleged declaration by Al Fialo, said that his interpretation of that was that these particular women were not to receive any special consideration, but were to be vetted just as if they were any other private citizens. I'm sorry, you're not answering the direct question. You're trying to say that we should disregard- that all I'm asking you is, as a matter of law, Your Honor, he has to have participated in some deception and gained from it. If you don't have the deception as an antecedent to the benefit, whatever that might be, knowing participation in it, the answer to Your Honor's question is no. You know, some type of benefit absent, knowing participation in a deception, does not place one in a fraud. And that is the problem in this particular case. And that's why I said- I emphasize, Your Honor, Basil Franklin testified that Sharp James at no time during the course of implementation of this program sought to intervene on the base of anybody, including Tamika Rowley. Am I getting your answer right, that you agree that benefit can be various types? Your problem is otherwise. Well, I think that- I put it this way. I think that benefit can be other types, but I think you have to analyze that in the context of the particular species of fraud about which one is talking, because this Court said in 2009 in McGeehan, when what you're talking about in the government's position is, what happened here was an undisclosed conflict of interest. And McGeehan, Your Honor, said that it has to be an undisclosed financial interest. Now, what is significant in this particular case, as well, if one reads the sentencing transcript, is that the trial judge subsequent to trial, and when he got to the sentencing phase, from my perspective, had developed what I would call a more enlightened understanding of exactly what this case was about. And what he said was, this case was about an undisclosed personal interest. He received no gain, and but for the fact that he had this extramarital affair, allegedly, we wouldn't be here. So from my conception, it's not a male fraud without participation and deception and no benefit based on this Court's analysis, United States v. McGeehan, absent an undisclosed financial interest, there's no crime. Mr. Bowman. Yes, Your Honor. How could we overturn a jury verdict when there is no claim by James that the jury instructions were incorrect? Well, Your Honor, very simply, there was no evidence. Okay. But you agree that you're not challenging the jury instructions? What we are challenging is a failure of evidence and also the- No, no. Let's give him a direct answer. Yes, Your Honor. Yes, Your Honor.  Yes, Your Honor. But we can press. Yes, Your Honor. There's no, you are not challenging the jury instructions? Yes, Your Honor. That's correct. Okay. You are not. Okay. All right. Well, can I, can I- On male fraud, you're not challenging. Not on, well, not on male fraud. There's a- What would happen to honest services? There's a challenge on honest services- Well, we know that. From which we join. But I would say to Your Honor, essentially, our focus has been on the lack of evidence and also what I would call exacerbation of, you know, the jury's finding on an abjectly lacking record with respect to evidence, what I would say aggravated by the other errors that followed, including, Your Honor, joining of Ms. Rowley's tax offenses in this trial. We've, I mean, we've, I mean, that, yeah, that's really not very persuasive. We've, I mean, we just did another case on that. The basis for the tax fraud or the tax charges was the money that she got in this whole deal. And so, she should have, there was no reason not to add the tax to the underlying crime. See, I think that the government voiced that relatively simplistic response on your eyes, but I don't think that- I think I just wrote an opinion on that. Whether it was an unpublished opinion, I can't remember. It's unpublished? One says yes and one says no. I don't think that the government proved that any income that she derived during the applicable time period was limited to whatever she got having acquired from these properties. I think that she had her tax problems were, what you might say, pervasive, you know, in a general course of her life. Well, certainly a lot of the tax problems, whether it's complete or not, I haven't checked, certainly part of them arose out of the alleged fraud with respect to the redevelopment area. And she got nine properties, was it? Something like that, Your Honor. You know exactly what I'm saying. His plan is more concerned about that than I am. But I would say, the problem with that is, as the court found at sentencing, is that Sharpe James, and Your Honors have already carried me across the threshold of the concept that the benefit can be other than money. But there's no doubt that Sharpe James did not win. It took a long time to get to that point. Well, I'm getting older. You know, I remember maybe 20 years ago, the first time I appeared before Your Honor here. How long ago was that? 20 years ago, a long time ago. I was here, did you win? I don't know, I don't recall that. But the experience was very enlightening with that respect. But, you know, the concept here is that her financial problems and her reputation as a wastrel in a tax sheet, as it were, aggravated the general concept that a man not shown to have been involved in any deception, not having done any personal intervention, anything of that sort, was saddled with this next level of prejudice, because to the degree to which the jury denigrated her and her character, it spilled over onto Mr. James. And in our view, Your Honor, resulted in unjust conviction. In the same fashion, when Basil Franklin blurted out that Mr. James' former chief of staff was in a work release program, notwithstanding the fact that the court admonished everybody that wasn't to be discussed, happened three times. You had lights on. One question. The jury, after they got down to what was put to the jury for their consideration, did they acquit on anything? No. Okay, thanks. Thank you, Your Honor. We'll hear from Ms. Riley's counsel. She's out of prison now. Oh, I'm sorry. You better put your name in. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Gerald Crow-Vayton appearing this morning on behalf of Tamika Riley. Mr. Crow-Vayton, they're both out of prison now. They are. That's correct. And they both served their full sentence. They did, although... And the government has its cross appeal with respect to the sentence. That's correct, Your Honor. Is anybody going to answer the... Oh, you'll do that on rebuttal, I guess. Well, I'm prepared to address both the honest services fraud issue in the case as well as the sentencing issue. In the five minutes that you have. Go ahead. Pardon me, Your Honor? In your five minutes. Well, I'll do the best I can, Your Honor. Your Honor, I do want to address the honest services fraud aspect of the case as well as the sentencing issues. I should note that Ms. Riley has completed her entire sentence, and Mr. James is still subject to a community confinement obligation that he's fulfilling. Your Honor, with respect to the honest services fraud conviction here, I want to focus the Court specifically on... But that wasn't against her, was it? Yes, it was, Your Honor. It wasn't against her. Yes, she was also convicted of conspiracy with Mr. James to deprive the citizens of Newark of his honest services as mayor. With respect to that, Judge Martini, when he charged the jury with respect to honest services fraud, didn't have the benefit of this Court's decision in the Carbo case, which we've cited in our reply brief. Specifically, Carbo held that where a private citizen like Tamika Riley is charged with conspiracy to commit honest services fraud by a public official, the prosecution must prove that the defendant knew that the public official was required by law to disclose the conflict of interest. And that was clearly not instructed here, and there was clearly no proof. Did you ask for that instruction? We asked for a variation on that, Your Honor, but we did not ask for that specific instruction. Well, then you can't complain about the Court's failure to give the instruction if you didn't ask for it. Well, Carbo, Your Honor, was decided after the trial in this case and was indeed— Well, but it's always been the rule that you have to ask for an instruction in order to object to the failure to give it. So you're claiming— Even 30 years ago when I came forward. You're claiming plain error? Alternatively, we would claim plain error, Your Honor, on that point. There was nothing— What is it that you say the Court should have instructed that it didn't? Well, we would submit that the Court should have instructed the jury that the prosecution had the burden of proving that Ms. Riley knew that Mayor James had a duty as a matter of law to disclose a conflict of interest. And we asked, as I said, for a variation on that, and Judge Martini gave a different instruction. So it's— What did he say that almost covered it? Well, he said, and we set this forth at page 7 of our reply brief, he talked about the duty to disclose in a nondisclosure case must be clear and unambiguous, and that the nondisclosure of information must relate to a material matter. He did not, in his instruction, address the critical point of Carbo, which was that the government also needed to prove, as a matter of Ms. Riley's actual knowledge, that she knew that Mr. James, Mayor James, had a duty, a legal duty, and was required by law to disclose the conflict of interest. But Carbo came out after the instructions in this case. You can't fault a district court for not instructing something that either wasn't asked and that wasn't part of the law. Well, to the extent that we're here on direct appeal, Your Honor, we think it would be appropriate for the court on remand to— Do you really want—I wanted to ask you that. Do you really—do people really want a neutron? You want us to—is that what you are out to get? You want us to say that after they were convicted and after they— or let's say your client, and after she served her sentence, that we should go back and, say, have a new trial? Well— I mean, I think the U.S. Attorney will pounce on that. I think all sorts of things could happen if the court were to reverse the convictions in this case, Your Honor. But what do you want? Well, we ask the court to reverse the convictions, remand for a new trial. That's absolutely correct. You want a new trial? Yes, Your Honor. Wow. Okay. And with— You think that's the benefit of your client? Well, she ultimately would have to make that decision, Your Honor. But certainly, in response to one of your other questions, this is certainly a case where it was phrased by the trial court and tried by the government as a failure to disclose case, a conflict of interest case. And with respect to that, it's our position that really under Carbo, the district court had a duty to give a different instruction. And you want— And all the publicity that comes around attending with a new trial? Well, all right. I mean, you're the lawyer, but— Your Honor, if I— That's what you're asking us to do. Go ahead. If I may briefly on the sentencing issues— Yes, because they're appealing. So I think we should— Yes, Your Honor. The government has cross-appealed from Judge Martini's sentence. Yes. And with respect to that, we would submit that Judge Martini did do a proper sentencing analysis here. And he made it very clear when he started out— He didn't enhance for the dollars, right? He— Well, he— Did you have to do under the sentencing guidelines? Well, it was clearly within his discretion, Your Honor, to determine, as he did, that a proper guidelines analysis, that is taking into account the gain to Ms. Riley from the sales of the property, as he found overstated the seriousness of the crime in this case. And the guidelines 2B1.1, particularly Comment 19C, specifically permit the district court to make that determination. So while he may not have articulated it precisely, he was clearly making the guide— He was taking into account the guidelines analysis, an argument that the government made, and he was implicitly, if you will, making a departure in that second step, and then went to the third step properly and applied the 3553A factors. What he did was he did say, I think it's too speculative. In any case, I would depart downward. But he never said exactly how the calculation of downward departure would happen. I thought as part of the, you know, sentencing drill that's done— Under Gunther in that court. —in the three stages, that he has to say that. That, okay, well, it's too speculative, but even so, if I'm wrong, I would depart downward by this amount because of this reason. Doesn't he have to do that? Well, he did say several times, Your Honor, that even if I were to apply the guidelines and even if I were to fashion a guideline sentence, I wouldn't adopt the government's argument. So he may not have used the word departure, but he clearly—the result was the same. Doesn't he have to tell us how much? That, you know, I would go down this many levels because of this. Doesn't he have to do that as part—before he gets to the 35— I think implicit in his sentence, Your Honor, was that he would have reached the same result in terms of the actual sentence had he formally used the word departure in saying that he didn't think the government's argument was appropriate under 2B1.119C. Okay. And with respect to that, Your Honor, as your court is well aware, he also found that he couldn't say with confidence that the loss figure would have been the same had she not flipped the properties and had she done the rehabilitation. In other words, I think he was really saying there's an approximate cause issue here as to whether the fraud, as proved, caused the harm or the gain that the government was seeking. Any further questions, Your Honor? Thank you. Thank you, Your Honor. Good morning, or good afternoon. May it please the Court, I'm Norman Gross, Assistant United States Attorney, and with me at the Council table is my colleague Judith Germano. She was one of the trial prosecutors in this case. You want a chance to try this again? Your Honor, we don't want a chance to try this again. We just want a chance to resentence the case because the district court judge made a grievous error in the first step of the sentencing process, and that is that he sentenced these defendants as if Ms. Riley's gain was zero, when, in fact, the testimony that we presented that wasn't really seriously contested by the defendants was that Ms. Riley's gain was approximately $431,000. That's a 14-level difference between In fact, that was the amount that was, well, the argument was it was around $400,000. I mean, they admitted around $400,000. Mr. Krovatin, Ms. Riley's attorney, submitted a sentencing letter in which he conceded that there should have been a 12-level enhancement because he conceded that the gain was between $200,000 and $400,000, but he argued that it didn't exceed $400,000 because of certain expenses that Ms. Riley accrued that we claim we took into account. Isn't it true that Newark, you didn't show that Newark lost any money as a result of this alleged fraud? Nor were we required to, Your Honor. Well, yeah, you're doing the same thing that he did. That's true, Your Honor. We didn't put on evidence that the city was out of pocket. Lost no tax revenue as a result of the actions by James and Riley. What the city lost, Your Honor, were a couple of things. First of all, they lost the honest services of their mayor, who was using his official power to behind the scenes transfer very valuable real estate to his girlfriend without disclosing his conflict of interest. But was there any victim in this crime? Well, the victims, Your Honor, the actual victims, the city was the victim in the sense that it lost honest services. The indirect victims were people like Wendy Bailey, who was a legitimate real estate developer and a witness in this case, who testified that she attempted to participate in this program as a qualified person and she could not get any of these properties that were supposedly set aside for legitimate real estate developers so they, in fact, would be developed. The only way that she could get properties was by going to someone like Tamika Riley, who had a 24-hour connect and a hook in the city, in her own words, because she had an intimate relationship with the mayor and she had to pay the corruption tax to Ms. Riley. She had to pay much more money to get these properties from Ms. Riley than she would have been able to purchase them for at the rate that the city was selling them to for legitimate developers. Now, Your Honor, Mr. Crow-Vayton said that Judge Martini, you know, in effect granted a departure and he said that he would have come to the same result. Well, that's simply not permissible under the three-step procedure that this court has laid out following Booker. There's three discrete steps and they have to be handled discreetly. And the first step is that the court has to correctly calculate the guideline range. And here the guideline, you know, there were a number of arguments that we made regarding which books should be applied and whether there should be a roll. We haven't appealed those issues, although we have arguable claims with respect to those. But the clearest error that the district court judge made here was assigning zero levels for the enhancement. And the court tried to justify that by saying the amount of benefit was speculative. Well, first of all, there's nothing speculative about our proofs. We put in the documents that showed how much Ms. Riley paid for these properties and we put in the documents that showed how much she sold them for. And then according to this court's recent opinion in Leonidas, it would then have fallen to Ms. Riley to show that she had some expenses and what the net benefit was. But Judge Martini said that somehow this mathematical evidence that we put forward was so speculative that he determined the benefit was zero. It's clearly insupportable. And because we argued that that was an error of law, he refused to apply the guidelines as written, that this court should review that under plenary review and send it back for resentencing. And at that point, if Judge Martini wants to entertain arguments about departures and puts us on notice, which wasn't done in this case, that he was contemplating a departure, then we'll be able to thrash those things out in front of him. Doesn't it appear from the district court's language and sentencing that the district court will not alter the sentences even if we remand it? And if that's so, isn't a remand a meaningful act? Your Honor, it's not meaningless for two reasons. First of all... Meaningless. Meaningless. It's not meaningless for two reasons. Your Honor, we can't assume that Judge Martini is going to give the same sentence. If he has to start off at a guidelines offense level that's 14 levels higher, that's almost twice as high as the offense level that he started out with. He gave a sentence within the guideline range for Mr. James and he varied downward a little bit for Tanika Riley. But if he's got to go up 14 levels for each of these defendants, I think we simply can't assume that he's going to reach the same sentence. But also, this court has been really exacting in requiring district court judges to follow the three-step process. Booker, of course, threw federal sentencing into some disarray and made the guidelines advisory, not mandatory. But it didn't say that we are returning to a pre-Booker regime where the district court can basically impose whatever sentence he or she wants for any reason that he or she wants. It has to follow the prescribed procedure. What does the government gain by asking us to send it back, have the district court sentence it again, and maybe put them back in jail? What is the use of that? The government, Your Honor, gets... And we hear that the jails are overcrowded anyway. Well, Your Honor, we asked for a sentence substantially higher than this and we thought that the guidelines supported a much higher sentence than this. And we're going to ask Judge Martini when he uses the, you know, if this court remands this case and directs him to apply the proper guidelines analysis, we're going to ask him to impose a sentence within the guideline range. Now, because of the difference in which book we're using, it would be a lower range than what we were seeking in the initial sentence. But we're entitled, Your Honor, to have the sentencing take place according to the rules established by this court. Okay. We understand your position on the sentence. Tell us, just to move, what charges, suppose the Supreme Court says that the honest services charges are not, cannot be sustained. What charges in this case would remain? Well, Your Honor... I mean, as I remember, honest services was count seven. Am I wrong? Five, Your Honor. Five. There are a couple of scenarios. There are three cases currently in front of the Supreme Court, and they raise somewhat different challenges to Section 1346. And so it's really impossible to determine what the outcome of all three of those cases will have. But assuming the worst possible outcome for the United States, and that is that the Supreme Court will decide that 1346 is facially unconstitutional for vagueness, and that no one should be convicted under the statute. Now, I should point out that this isn't a claim that the defendants raised in this case, but if the Supreme Court came down and said that no one should be convicted under 1346, even though they didn't raise it, they probably could get relief under plain air. But that holding would say that that particular statute, 1346, not the mail fraud statute, 1341, but 1346 is unconstitutionally vague because it doesn't define what honest services are. Honest services are not, the government does not have to prove a deprivation of honest services for counts one through three, the mail fraud counts, nor does it have to prove a deprivation of honest services for count four, the 666 counts. So those counts would be unaffected by anything that the Supreme Court decides. Was the sentence calculated in terms of the different counts? Your Honor, with respect to Mr. James, all of his counts of conviction, one through five, were grouped together as a single group, and the determination was made based on the base offense level and a number of enhancements that apply to all of the counts. So you're saying the calculation on that point would come out the same? Yes. Okay. What about Ms. Riley? I'm sorry. It wouldn't come out the same? No. I misspoke. It's possible that if the honest services fraud conviction were vacated, that the government would be under a different guideline. It would be under the general fraud guideline, which is 2B1.1 rather than, in this case, 2C1.7, the 2001 version. So we may have an entirely different guideline calculation in that circumstance. So, in other words, what I'm saying is the loss of the count five conviction, for whatever reason, would not affect the convictions on counts one through four, but it might affect how the sentencing guidelines calculations should be done. What do we do in that case? Because we haven't held up the appeal, and so they've served their sentences. We're talking about Mr. James now, not Ms. Riley, right? Actually, neither of them have completely served their sentences. Ms. Riley is still on supervised release. Yeah, but counts one through three and four, does that apply? I don't remember. Does that apply to both or just Mr. James? Both defendants were convicted on all counts. Mr. James, I'm sorry. Mr. James was convicted on counts one through five, and Ms. Riley was also convicted for additional tax and housing fraud counts. Yeah, but did the counts say both of them? Like counts one, we have it here somewhere. Yes, both defendants are charged in counts one through five. Okay. Should we hold this case until the Supreme Court decides the honest services case? Your Honor, I think that probably would be the wisest thing to do. I mean, we really can't anticipate what the landscape is going to look like until the Supreme Court decides this. And, of course, the Court could ask for additional briefing in light of the Supreme Court cases. We always do that, yeah. And the decisions hopefully will come down at the end of this term, which should mean the third week of June. Presumably, yeah. And this is April, so not September, yeah. Yes, it wouldn't involve a long delay. I mean, that's with respect to count five only. One thing the Court could do would be – no, I was thinking you could rule on the other claims, but if you're going to issue a single opinion, it makes sense to wait for all of them. It sounded to me like there was some kind of concession that there was at least $200,000 worth of loss. And would that raise the guideline range? Under 2C1.7, Your Honor, it would raise it 12 levels. To get to 14 levels, you need to be over $400,000. Okay. And that's all under the 2C, not the general fraud 2B1.1. That's correct, Your Honor. I got it. Yes.  regarding Fayella's statement. Isn't that an admissible hearsay? It absolutely is not an admissible hearsay, Your Honor, and I'll get to that in just a moment. I'd like to point out that is hardly the only evidence of Sharp James' involvement in this case. There is a plethora of evidence of Mr. James' involvement beside this statement by Mr. Fayella to Mr. Franklin. The fact that Mr. James is the person that Ms. Riley is running to every time she encounters problems. The fact that Mr. James then takes action and that he directs his underlings to do things for the benefit of Ms. Riley. The fact that Mr. James is up to his elbows in this program. He's trying to allocate properties to his former chief of staff. But you didn't answer my specific question, which is wasn't it an admissible hearsay? It was not an admissible hearsay, Your Honor. The district court judge properly exercised his broad discretion under 801D2D in finding that Mr. Fayella's statement to Mr. Franklin was the statement of an agent made in the scope of his agency during the course of this case. But how could he, how could it be within the scope of Fayella's employment? Your Honor, it's squarely within the scope of his employment because what Mr. Fayella is saying to Mr. Franklin, his subordinate, he's saying our boss, Mr. James, wants us to help Ms. Riley and this other woman get properties. Now what's Mr. Fayella's job? He's the head of the Department of Economic and Housing Development. And he's talking to Mr. Franklin about this SWRP program which is administered under that department. So this is right in the wheelhouse of his duties to oversee this particular program. And Mr. Fayella is talking to Mr. Franklin about a direct order from their mutual boss, Mr. James, to take action regarding this program, which both of them are involved in. Can you see? I'm going to, I have to, I'm going to, I think, sit in Newark at the end of June and July. Can you see the SWRP area from the Federal Courthouse? I don't think you can. It is in the South Ward, and I have to confess, when I go to Newark, I typically go to the U.S. Attorney's Office and don't go to the other parts of Newark. I do hear mention of Elizabeth Avenue as one of the places where some of the renovations were done, and I don't think that that is close to the Federal Courthouse, which is on Brooks. Thank you very much. If there's no other questions, thank you. I think I have reserved two minutes, I think, Your Honor. Yes, if you've reserved it, we'd love to hear from you. A couple of very brief things in 120 seconds. First, Your Honors, with respect to Mr. Gross's emphatic claim that Al Fayella came to Mr. Franklin and said, this is like an edict from our boss, Mr. Franklin, when he recounted this inadmissible evidence, said Al Fayella came to me smilingly and jokingly, which I suppose was a small matter from Mr. Gross's perspective. Secondly, I would point out something else Mr. Gross said. Mr. Gross said a corruption tax on the basis of acquisition of this very valuable real estate. One of the things that is at my office, unlike Mr. Gross, my office has been in Newark since 1984, and this was not valuable property prior to the SWRP. They could not give it away. Well, that appears. And they created some, I don't know, maybe even to some degree an illusory excitement about this property when there was a sort of exclusivity attached to it in the procurement process. But there is, in my last final seconds, I just want to emphasize that there was no evidence in this case that Mr. James ever intervened on anybody's behalf, including Ms. Riley. There's absolutely no evidence. Mr. Bowman, do you agree that we should hold this until the Supreme Court decides the honest services issue? Well, I'm in a very difficult sort of Kafkaesque position to the extent that I believe that there was no evidence of any deception knowingly by Mr. James in any benefit, and that Your Honors have ample grounds as we stand here to reverse counts one through five. But I will rely upon the wisdom of this Court with respect to whether or not some other option is more propitious. Thank you very much. Thank you, Your Honor. Thank you, counsel. We'll take the case under advisement.